Underwriters of Lloyds, et al. Mr. Martin, you may proceed. You reserved three minutes for rebuttal, I think, right? Yes, thank you, Your Honor. May it please the Court, good morning. My name is Craig Martin. I represent Olin Corporation. With regard to the appeal in this matter, the standard is de novo. Our basic position is that the plain language of the settlement agreement does not modify the continuing coverage provision of the insurance policy. Can I ask you a threshold question? Yes, please. Can you address the issue of subject matter jurisdiction? I know that the rules regarding subject matter jurisdiction where Lloyds of London is involved are rather complicated. The complaint in this case alleges only that at some prior time to the filing of the complaint, counsel had confirmed that the parties were completely diverse. Does that satisfy the requirements for pleading subject matter jurisdiction? Did the district court not have an obligation to confirm that it had subject matter jurisdiction? Thank you, Your Honor, for that question. The subject matter jurisdiction, with regard to the way I believe it was pled, and with regard to the inquiry into it over a period of time, was that there was complete diversity. And that representation, I believe, was made by the Lloyds underwriters or London underwriters to the district court. The complaint says, as previously represented to Olin by counsel for London, there is complete diversity. It doesn't say what the basis of that was. It doesn't say at what point in time. I mean, this litigation has been going on for 35 years. For all we know from that allegation, that was based on a representation in 1989. And given that complete diversity has to be established at the time of the filing of the complaint, how does that suffice? Respectfully, I do think it suffices for this particular case. There's been a long history in which that inquiry has been made and that representation has been repeated to the district court. My recollection is not perfect on this particular issue, but my recollection is that that inquiry was made before we filed this complaint as well. The district court has been satisfied with that, and I believe, I don't know if they re-represented it in front of the district court, but that's the representation that's been made with regard to complete diversity. So I think this court does have jurisdiction as well as the district court with regard to the appeal, Your Honor. That's the best I can do on that one. With regard to the substance of the appeal, in many cases the briefs are complicated, the law is complicated. In this case, the briefs are not that complicated, the law is not that complicated. I refer to page 10 of the reply brief where we simply repeat condition C, or the continuing coverage provision, and section 7D of the settlement agreement, which essentially contains the core of the entire argument with regard to this case. The settlement agreement, just to scope it out for a moment, this was not a policy buyback settlement agreement. This was not a settlement agreement in which claims were the complaint was dismissed with prejudice and there was a general release and a payment. This settlement agreement involves certain claims being released. It also involved a coverage in place agreement with regard to other claims. So, for example, with regard to the particular factual claim here, the Morgan Hill claim, the coverage in place agreement was there's a clear change to the deductible, there's a clear change to the notice provision, and then when you get to the change to allocation, there is a clear change with regard to allocation of property damage is going to be pro rata equally. Property damage losses. Property damage, Your Honor. That's the whole ballgame as far as you're concerned. You're asserting that property damage losses is different than property damage for purposes of Paragraph D, right? Yes, and in Paragraph D, to kind of go through it, Paragraph D talks about, begins with, and Your Honor, I always put it next to page 10 on the reply brief to do the comparison, but property damage losses related to pollution at real property owned at any time by Olin. The property damage relating to any pollution claim, which is defined in the agreement, shall be allocated pro rata equally, and then there's a particular time frame depending on which one you're talking about. What it does not do, Your Honor, and if you compare it to the second paragraph of Condition C, which is the continuing coverage paragraph, the continuing coverage paragraph states that property damage, if it is continuing at the time of the termination of this policy, the underwriters will continue to protect the assured or insured in respect of such property damage without payment of additional premiums. So if you wanted to talk about liability, you could have easily matched up the phrases, if you will. With regard to this provision, it only goes to the allocation of property damage. Your Honor, I think you probably are asking the question about, well, why do you begin with losses? Well, property damage, look, we're not ever going to be talking about property damage in isolation. It always has to have losses associated with it because property damage for which there's no remediation would not be covered by the insurance policy in the first place. So we're just tagging into you. You wouldn't need the word losses at all? You're saying the word losses is redundant. The word property damage losses I think just refers to there's economics associated with it. Then property damage is referring to the factual allocation. And then if you wanted to make this clearer so that you were changing Condition C or the second paragraph, you would add another provision, and the provision would say something like you are limiting coverage to that particular policy in that particular year as opposed to having continuing coverage. So this does not match up in that sense, Your Honor. And that's what the plain language of the agreement is. That actually syncs up very closely with regard to where the parties were at in the litigation. The litigation with regard to these matters was essentially litigation over when property damage began, when property damage ended, and how much property damage occurred in every year. So, for example, in a previous appeal and trial, Niagara Falls, which is referenced in these briefs, the big issue was there was an explosion at Niagara Falls in the mid-1950s, so all of the property damage literally for the most part occurred during two years. Very big factual issues around when property damage would begin. But then how you allocate it for purposes of liability is governed by the contract. And most of the cases that we've had against London and other insurers have not involved, had not involved Condition C or continuing coverage. They had involved the several policies of London as opposed to the joint and several policy that is part of Condition C. So with respect to the language, the language goes to property damage. So it says, for property damage losses related to pollution, dot, dot, dot, the property damage relating to any pollution claim shall be allocated pro rata. So you're saying the first use of the word losses is just surplusage? No, I'm not saying it's surpluses. I'm saying it's... So you're saying property damage losses is distinguishable from property damage used elsewhere in that sentence. Yes, exactly. Okay. And property damage losses ties you into economics. Now, Your Honor, this particular provision, 7D, would then in the future, right, apply to both the policies of London that had Condition C in it, and it would apply to the policies of London that didn't have Condition C in it. So it was going to have to, you know, how the law would apply to property damage being allocated in this manner would be determined under the terms of the policies, not under the terms of this particular allocation. And, in fact, Your Honor, may I go on? I'm a minute and 22 over. In fact, Your Honor, I think the district court's logic, you know, with all due respect to the district court, was flawed in two fundamental respects. One is the district court really failed to appreciate and take into consideration the fact that this settlement agreement was not a settlement agreement. This settlement agreement was a coverage-in-place agreement with regard to Morgan Hill as to how that was going to go forward. There was no intent to settle Morgan Hill and many other of the sites in this agreement. So he misses that when he goes through and says you were just trying to get this over. In fact, we're, you know, the 34-year litigation is continuing. Well, I think his point was that you were trying to resolve the issues that had bedeviled the parties for 30 years and established clear rules that could be applied going forward. I'm not sure what rides on whether this is a quote-unquote settlement agreement or a coverage agreement. Yeah. I think maybe more finely stated, Your Honor, by me, or more precisely stated, the issue that had bedeviled the parties and had cost a lot of money was how do you factually allocate property damage. That's what the trials were about, with lots of expert testimony about that particular issue. But ultimately, that only matters for determining whether then having factually allocated in that manner, it's then covered, correct? Absolutely. It's academic, but for that next question. Absolutely right, Your Honor. And that next question is then answered by the policies, right? And the policies are different. Some of them have Condition C. Some of them don't have Condition C. At this particular moment in time, right around the time that the settlement was going on, London was engaged in vigorous litigation in Delaware, contending that the continuing coverage provision was actually a pro-rata provision instead of the all-sums provision that Viking Pump ultimately found. The second big error, Your Honors, with regard to the district court's logic, was the district court basically reasons from things that happened in the future with regard to the party's intent in the past. Don't you ask us to do the same by invoking Olin III? Olin III postdates the agreement as well. I really don't. I mean, I've read the briefs. But our most fundamental position is you should look at the party's intent at the time. The party's intent at the time is not conditioned by... There's no reference, if you will, to anything with regard to how Condition C, that continuing coverage provision, is going to be interpreted or not interpreted. And in fact, it's not even clear whether it will become relevant in the future. So that's why there's no focus, I think, on Condition C at the time. And what the settlement agreement does is it very clearly changes the notice provision. It very clearly changes the deductible. And it does very clearly change allocation of property damage. But it doesn't answer the next question, which is how does that play out after you put the marble in the top of the thing and come out through the policy regime. With respect to policy years 61 to 69, which contain the continuing coverage provision, if there is a loss or damage in some other year, then you would agree that the provision D of the allocation agreement governs, correct? You're saying that Condition D for property damage losses in the allocation agreement does not control the allocation policies 61 through 69? Your Honor, I'm saying that Condition... 61 to 69 has its own allocation system. Well, it depends on how you're using the word allocation, Your Honor. What I'm talking about is the factual division of property damage over a period of time. So if you have a loss that holding my hands up is this wide, it's equal division. That was the whole point, so that we wouldn't have to fight about the facts. However, once you get past that factual determination of allocation of property damage, then how that works through the policy regime, the law, depends on what the particular policy says. So if there's the 1959 policy is at issue, you look at that policy. If it's the 1966 policy, you look at that policy. And at the time of the contract, the settlement agreement, London's vigorously litigating these issues in Delaware. Nobody knows where they'll come out. It's the 59 policy. Then how does the allocation work? I think the allocation in the 59 policy, by memory, is several. So it's basically I think the 59 policy is limited to the years that particular year. It's not until the 61 through 69 policies that it has this continuing coverage position, which the court ultimately found in Olin 3 basically allowed you to go forward in time and sweep back  So it's not just a case of taking pump, different case, different clients, different companies. But the court basically said that you can go backward and forward. All right. Thank you very much. We'll now hear from Mr. Anderson. Good morning, and may it please the court. My name is Matt Anderson for the appellees, the various London market insurers. And can you address the subject matter jurisdiction issue? I will do it as best as I can. My understanding is in the 1984 action, this issue was briefed before this court in the very first appeal that London was involved in, in 2002. And it's important to know the London market insurers that are at issue in this case are the 1950 to 1970 London companies and underwriters. And I believe, if my memory serves, that the London underwriters could not be U.S. citizens prior to 1970. And there was diversity in that regard. Now, with regard to whatever finding was made in 1984, that is sufficient for purposes of the complaint filed in 2018, is that correct? Or is it possible that the names would change between 84 and 2018? I guess that's my question. The names would not change. They would be the same individuals. They might be domiciled differently or resident differently. They might be bought and sold in different places. That is possible. The other overlapping issue here is, believe it or not, London was still in the 1984 action in 2018, because after Olin 4, there was remand against another insurer of Olin Lammarack, and they brought a contribution action against London. And so we were in the 1984 action. But if it was resolved that at the time of the filing in 84, there was subject matter restriction, that doesn't change if someone changes domicile between 84 and 18. But the question is, in 2018, whether the court could rely on the 84 determinations or it had to satisfy itself that there was actually complete diversity. I mean, doesn't it have to make that determination at the time of the filing? I mean, am I wrong in thinking, looking at the docket, it seems like there was no litigation about this issue in this case. I think everybody operated on the assumption that there was complete diversity and really didn't give it any second thought. Is that a fair statement? I think that's fair, because this action was filed September 7, and the 1984 action was settled in August 28 or 29, and it wasn't dismissed until after this one was filed. So there was overlap there, but I think that's correct. The district court correctly ruled in this action that the allocation agreement requires that the losses be allocated pro rata equally over all the periods of triggered policies, which are those policies in effect during the years of operation at the plant sites owned by Olin. And in so ruling, the district court correctly rejected Olin's premise that the settlement agreement somehow did not resolve the ultimate issue that the parties were litigating over for 25 years, and that is, what is the loss that's associated with the policy? Isn't looking at that litigation history effectively looking at parole evidence? So don't we have to first make a determination of ambiguity or lack thereof before we even look to that? No, because I think looking at that litigation, it's law of either the case or law of collateral assault on Olin and London and law of New York. And so it informs what the controlling law was, and I think that that's what the district court was looking at in addition to the four corners, which he found that it was unambiguous. Would your argument be the same if somehow paragraph D and condition C appeared in the same agreement? In other words, if somehow the parties had put both in the original agreement, would your argument be the same? In the original insurance contract, the argument would be different because there would be a conflict there, and you'd have to figure out in the one contract which one controls. But stepping back a bit, under New York law, pro rata allocation is what they call a legal fiction, because nowhere in the contracts does it say pro rata allocation. And under Con Ed, the Court of Appeals said this is a legal fiction, but this is the best way to do it, absent other language that tells us how to allocate a loss. So now in Viking Pump, in 2016, the Court of Appeals looked at condition C, which is that other language that they rely on, and they said, well, condition C contemplates loss, and or damage taking place in more than one policy period, so therefore it's antithetical to pro rata allocation. So pro rata allocation must step aside for policies that contain condition C. Here it's different, though. Here, what the parties did in 2009 was codify that legal fiction, and it became an express term of a contract in 2009. So the 2009 allocation agreement takes precedent over the 1960s condition C policies, and the district court correctly held that condition C must step aside or give way to the allocation agreement. But wouldn't the first obligation be to try to harmonize the two? Well, under that hypothetical, but here, the allocation agreement, well, I see what you're saying. So Viking Pump and the Court of Appeals told us pro rata allocation and condition C cannot be harmonized, and I don't tell us until seven years after the parties reached the agreement in this case. That's correct, but as a matter of law, condition C cannot be harmonized with pro rata allocation. And so when you have a pro rata allocation agreement, that controls. And what the Court of Appeals said in Viking Pump at page 1154, they said under a pro rata allocation, no policy covers a loss that began during a particular policy period and continued after termination of that period, because that subsequent loss would be apportioned to the next policy period as its pro rata share. Using the pro rata allocation would therefore render the continuing coverage clause irrelevant. And Olin has no answer to that, and that language is fatal to their cause of action. The express wording of the allocation agreement clearly relates to the allocation of loss, because it provides for property damage losses relating to pollution at property that Olin owns. The property damage relating to any pollution claim shall be allocated pro rata equally over the entire period of operations. The clause does not say, or it does not treat allocation of loss and allocation of damage separately. And under New York law, pro rata allocation triggered policies pay the loss, right? And the loss is what the damage is in the particular policy period. So in other words, when this clause, the reference to property damage in the last part of the sentence, that's talking about, and it is informing, the loss being allocated in the front part of the clause. And as the district court found, in accordance with New York law, read most naturally, it requires that the losses be allocated pro rata over the period of operations at the end of the policy period. And it's important to note that Olin agrees that that's how that clause operates, at least with regard to policies that don't contain Condition C. It's only when you get to a Condition C policy do they say, well, now the allocation agreement is a factual question, but that's not a reasonable reading. And the way we know that's not a reasonable reading is the settlement agreement specifically says the allocation agreement changes the policies going forward. So what was a jury question, which damage happened during the policy period, was a jury question. Well, it only changes the policy, it only changes the policies to the extent it changes the policies. The allocation agreement changes the policies, and we know that means it doesn't just answer a factual question, it answers a coverage question, which is what is the loss attendant to the policy. What is the period of pro rata distribution? So the 1960s policy, oh, I'm sorry, for Morgan Hill? When you're looking at the entire period of time that any operation took place, which policies, which policy years does London argue are implicated? Well, the Morgan Hill side operated at least for 40 years, from 1956 to 1996, and it's London's position that the loss, the allocation agreement, is implicated over at least those 40 years. Now, with regard to the policies, the 1961 to 1969 policies have Condition C, but it's our position that Condition C, of course, must give way to the allocation agreement. And what about the years in which there's a pollution exclusion? So those aren't currently in the case. The pollution exclusion policies are starting in 1971 going on, so if you did allocate, you know, that's the whole point of this 25 years of litigation. Olin was coming in with experts to say, oh, damage at Niagara Falls happened in two years, 57 and 58, and London was saying, no, no, no, it's spread until the plant ceased operations, until every year groundwater came in and got polluted, there was additional pollution. But, so the parties litigated over that issue heavily over the years, but the one thing the parties didn't disagree on was that once a jury verdict came back with a percentage of damage in a given year, neither Olin or London disputed that that percentage of damage is what that policy paid for. And between 2005 and 2008, there were no fewer than five Rule 54B judgments entered before the district court, and in each and every case, the jury verdict came back with a percentage of damage. So the policies that were implicated paid the, or they were attributed the loss of the property damage that took place in that period. And I see I'm over time, but if I have, I don't know, any other questions? No. Any other questions? Thanks very much. Thank you. Mr. Martin, you've got three minutes. Yes, thank you, Your Honor. A couple of quick points. Point one is, fundamentally, this is a contract case. The duty of contract interpretation and the rules are relatively clear. You look at the four corners of the agreement to discern the intent. So, Your Honor, with regard to the questions about parole evidence, our answer would be different. You look at the contract and the language of the contract. You don't look at the whole thing. You look at the rules. And I think that's a good point. And I think that's a good point. And I think that's a good point. We do, and to respond to the district courts, to respond to what the district court did. But fundamentally, Your Honor, this is a straight-up contract case. Contract propositions should be the first rule of order, if you will. If I'm not mistaken, you cite cases in your brief for the proposition that where the question is whether a later contract modifies an earlier contract that there's a new rule of order. You can liberally use parole evidence. How do you square the argument you just made with that argument? I think what we're doing in the brief is we're essentially taking a look at a series of factors that you can take a look at with regard to contract modification. And we stand by our brief. But in terms of the fundamental way to look at this case, it is to go to the four corners of the document and the language of the document. There may be some other things that are helpful under that particular legal standard, which really leads me to the next point. In these contracts, because you have two of them in front of you, and that's why I go to page 10 of the reply brief where they're next to each other, the duty of the court is to first try to reconcile those, right? To reconcile those provisions and see if you can come up with the meaning with regard to those provisions from the language that is used. That very much parallels the contract modification rules that are cited all over the briefs with respect to how a contract modification has to be clear and deliberate, and sophisticated parties would clearly and deliberately change it. So, you know, point one is focus on the contract. Point two is look at the contract modification. With regard to the third point that I want to make very briefly is, you know, I think it's important to look at the contract modification. With respect to the prior litigation, going back in time, the prior litigation is under the several policies of London. So the focus of that litigation is with respect to where damage, property damage and losses associated with it and liability is going to be limited to a particular policy year. That's what's at issue. Not until the Niagara Falls appeal do we get a lot of traction with respect to what, how losses is defined and how it can be continuing and so forth, continuing in terms of passive spread. And then finally, I would just point out from a matter of logic, London's argument with regard to contract interpretation actually depends on what happened in the future. It actually depends on what the decisions, the actual decision was in Viking Pump and it depends on what the actual decision was in Olin 3. So if you go through the analysis with regard to that argument and you stop the music at the time of the settlement agreement, you come out with one result. If you go through, according to them, if you go through and you stop the music with regard to Olin 3, where it's future liability being swept back, you stop the music there and you come out with another result. If you go to Viking Pump and you say that's what the law is, you stop the music there and you come out with another result, which goes right back to the fundamental flaw of the district court with regard to logic. And that is the notion that Condition C automatically means joint and several is not known to the parties at all in 2000, at the time we're doing this agreement. It's, you know, in fact, in Olin 3, the Court of Appeals, the Second Circuit Court of Appeals, finds that it's not known to the parties at all. It determines what Condition C means for this policy. And then the New York Supreme Court, the highest body in the New York courts, came out with a different ruling. And then, Your Honor, you did ask a question with regard to the pollution exclusion and how that has been deemed to work with regard to this. It's a prior decision of this court and the way it's been determined to work is that the last year that Condition C was in effect, it was a prior decision. The last year that Condition C was in the policies, I believe, is 1970, at least for policies that we've litigated. Isn't there a gap in insurance for one year somewhere there? There may have been, Your Honor. In any event, if in 1970, right before the pollution exclusion came into effect, there is damage that is continuing, even though it continues past the time that the so-called pollution exclusion starts getting traction in 71 and 72. It's still swept back to that policy year under the contract. That was a different fight that we had at one point in these courts. I have nothing further. I want to answer any questions you have. You do have the lawyer that's been involved in this for 15 years, not since before I was in law school. That's a good client, isn't it? Everybody dreams of such things. So far, Your Honor, so far. We're going to reserve, so that will give you a little more time. Thank you very much for your time. Thanks very much. Everybody have a good day. Thank you.